**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

**FILED**
September 8, 2006

**CLERK, U.S. DISTRICT COURT**

| | | |
|---|---|---|
| **JOHN GREGORY REILLY** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **vs.** | § | **Civil Action No.  3:05-cv-0081-R** |
| | § | |
| **TXU CORP., TXU BUSINESS** | § | |
| **SERVICES COMPANY,** | § | |
| | § | |
| **Defendants.** | § | |

## MEMORANDUM OPINION

Now before the Court is Defendants' TXU Business Services and TXU Corp.'s Motion for Summary Judgment (Dkt. No. 22).  After carefully considering the motion, response, reply, the summary judgment evidence, and the applicable law, the Court **GRANTS** Defendant's motion in its entirety.  A final judgment will issue by separate order.

## I. INTRODUCTION

Plaintiff John Gregory Reilly is a white male and a former employee of Defendant TXU Business Services Company.  Reilly has sued his former employer and its parent company, TXU Corp.,[1]  under 42 U.S.C. §1981 for racial discrimination and retaliation in employment.  Reilly claims that TXU discriminated against him based on his race by failing to promote him to the

---

[1]One of the contested issues in this case is whether TXU Corp. can be considered Reilly's employer under 42 U.S.C. § 1981.  The Court need not reach that issue because it finds that Plaintiff cannot present a genuine issue of material fact to withstand summary judgment against either Defendant.  Therefore, throughout this opinion the Court will refer to Defendants collectively as TXU.

position of Strategic Sourcing Manager in mid-2002.  Reilly claims that despite his qualifications and his long tenure at the company, a lesser-qualified African-American candidate was chosen for the position in a deliberate attempt to boost minority representation in management.  Moreover, Reilly claims that after being transitioned to another company, TXU retaliated against him for refusing to sign a general release form that was sent to him in connection with an offer of severance pay.  Reilly claims that Defendants notified his new employer that he had not signed the general release form, which, he claims, led to his prompt termination.

Defendants deny that its hiring decision was motivated by race and maintain that the person hired, Ayanna Clunis, had superior qualifications for the Strategic Sourcing Manager position.  In response to Reilly's claim of retaliation, TXU contends that Reilly never engaged in protected activity.  Further, because Reilly never complained to anyone that he was the victim of racial discrimination nor did he inform his new employer or anyone at TXU of his reasons for failing to sign the voluntary release form, the failure to sign the form could not be a cause in fact for his eventual release from employment.  TXU also claims that it had a legitimate, non-discriminatory reason for furnishing Reilly's new employer, Capgemini, with the names of all employees signing the voluntary release – a contractual obligation to notify Capgemini of employees entitled to severance benefits.

## II.  SUMMARY JUDGMENT STANDARD

"Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole which are designed 'to secure just, speedy and inexpensive determination of every action.'"  *Celotex Corp. v. Catrett*,

2

477 U.S. 317, 327 (1986) (citing Fed. R. Civ. P. 1).  Summary judgment under Rule 56(c) of the

Federal Rules of Civil Procedure is appropriate when there is no genuine issue as to any material

fact in the case and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(c); *Celotex Corp.,* 477 U.S. at 322; *Melton v. Teachers Ins. & Annuity Ass'n of Am.*, 114 F.3d

557, 559 (5th Cir. 1997).

　　　　The party moving for summary judgment bears the initial burden of identifying those

portions of the pleadings, depositions, answers to interrogatories, and admissions on file,

together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of

material fact.  *Celotex*, 477 U.S. at 323; *Calbillo v. Cavender Oldsmobile,* 288 F.3d 721, 725

(5th Cir. 2002).  Where the nonmovant bears the burden of proof on a claim upon which

summary judgment is sought, the movant may also discharge its initial burden by showing that

there is an absence of evidence to support the nonmoving party's case.  *See Celotex*, 477 U.S. at

325.  Once the movant has met its initial burden, the nonmovant must set forth specific facts, by

affidavits or otherwise, showing that there is a genuine issue for trial.  *See Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  To avoid summary judgment, the

non-moving party "must do more than show that there is some metaphysical doubt as to the

material facts." *Id.* at 586.  "If the evidence [proffered by the nonmovant] is merely colorable, or

is not significantly probative, summary judgment may be granted."  *Anderson v. Liberty Lobby*,

*Inc.*, 477 U.S. 242, 2549-50 (1986).  On the other hand, the evidence of the nonmovant must be

believed and all justifiable inferences must be drawn in its favor.  *See id.* at 255 (1986).

## III.  FACTS

The submissions of the parties establish the following facts, construed in the light most favorable to the nonmovant, Reilly.

### A.    Reilly's Employment History at TXU

Defendant TXU Corp. is the parent company of several regulated energy companies and their affiliates or subsidaries, one of which is Defendant TXU Business Services.   Until recently, TXU Business Services performed shared services for the TXU subsidiaries like human resources, procurement, and information technology services.

In November 1987, Reilly began working for DP&L, a predecessor entity of TXU Corp. Reilly continued working for TXU, holding several positions within the company, from part-time cashier to contracts representative to sourcing coordinator.  Most of Reilly's experience with TXU centered around procurement – procuring goods and services for the TXU subsidiaries, defining requirements with end-users, managing communications with suppliers, ensuring that goods and services were acquired in the most efficient and cost-effective manner, and negotiating and drafting agreements.

### B.    Restructuring of TXU Business Service's Procurement Department

In late 1999, Debbie Dennis, Vice President of TXU Business Services's Procurement Department, began restructuring the procurement department and implementing procurement strategies to reduce costs for TXU's subsidiaries.  After evaluating the department's processes and needs, Dennis determined that she could cut costs by, among other things, reducing the number of non-direct-report managers beneath her and further implementing a business model known as strategic sourcing.

4

### 1.     The New Management Structure

Dennis restructured the division so that she would have seven managers that reported directly to her. Under Dennis's plan, the seven direct-report managerial positions were: Corporate, Energy and Portfolio Management Procurement Manager; Electric Delivery Procurement Manager; Fossil Generation and Mines Procurement Manager; Vice President Supplier and Workforce Diversity; Technology Procurement Manager; Nuclear Procurement Manager; and Strategic Sourcing Manager.  Two of the positions – Nuclear Procurement and Vice President for Supplier and Workforce Diversity –  already existed within the company and retained their managers, Ramon Mendez and Cheryl Stevens. Dennis then began filling the five remaining managerial positions.

By Dennis's design, both the Strategic Sourcing Manager and the Technology Procurement Manager would support the efforts of the other five managers.  For that reason, Dennis filled the Strategic Sourcing Manager and the Technology Procurement Manager positions after filling the others so that the other managers could participate in the selection process. Although the two existing managerial positions that were retained in the restructuring were headed by minorities – Ramon Mendez (Hispanic male) and Cheryl Stevens (female) – four of the five remaining managerial slots were filled with white males.

### 2.     The Strategic Sourcing Managerial Position

According to Dennis, one of her goals in restructuring the procurement department was to shift the department's focus from "tactical procurement" to "strategic sourcing."  Historically, the company had used a "tactical procurement" approach to purchasing goods and services, which included, for example, writing requests for proposals, selecting the best proposal, and

5

negotiating and executing a contract with the winning supplier.  Dennis claims that she wanted to move the company toward a "strategic sourcing" approach to procurement, which involves an end-to-end analysis, negotiation, and organization of procurement processes to identify and exploit cost-saving opportunities.  In Dennis's opinion, strategic sourcing involved a more sophisticated and strategic analysis of total long-term cost of goods and services than did tactical procurement.

          **C.**       **The Application and Interview Process for Strategic Sourcing Manager**

TXU first advertised the Strategic Sourcing Manager position around March 26, 2002, by listing it internally on TXU's job posting website and externally on career search websites. The minimum requirements for the position were listed as follows:

> Minimum Requirements: Bachelor's degree with 7 to 10 years of strategic sourcing related experience and supervision or MBA with 5 to 7 years of strategic sourcing related experience and supervision or Non-degreed with 12 to 15 years of procurement related experience and supervision.

Applicants who appeared to meet the minimum qualifications for the Strategic Sourcing Manager position, were included in the applicant pool for pre-screening interviews.  Mary Gano, a human resources representative, conducted telephone pre-screening interviews of all external applicants and provided the information collected from those interviews to Dennis.   Applicants internal to the procurement department did not have to go through the telephone pre-screening interviews. Dennis and/or a member of human resources conducted a first-round interview with all applicants who passed the telephone pre-screening interview, as well as the applicants internal to the procurement department.

After the first-round interview, the field of applicants was narrowed and applicants that

remained in the pool were required to attend a panel interview.  The panel consisted of:  Dennis

(Vice President of Procurement), Geynille Dillingham (HR Representative), Ben Ezzell (TXU

Energy/TXU Corporate Procurement Manager), Bob Gentry (TXU Electric Delivery

Procurement Manager), Jim Breland (Fossil Production Procurement Manager), Cheryl Stevens

(Vice President of Supplier and Work Force Diversity), and Ramon Mendez (Procurement

Manager at Comanche Peak).  The panel interview process was a structured and purposeful

process wherein the same questions were created and asked of each of the candidates.  Each

panel member rated the candidates according to their responses to the questions. The panel's

members shared their thoughts on each candidate and the candidate's interview scores with

Dennis.  Dennis considered the input of the panel and the candidate's scores as one input in her

hiring decision, and the final decision on which candidate to hire remained with Dennis.

### 1.    Reilly's Interview Process

Reilly applied for the Strategic Sourcing Manager position as an internal candidate.

According to Dennis, Reilly met the minimum qualifications for the position.  Reilly had a

bachelor of business administration in marketing from Texas Tech University, an MBA from

Amberton University, and over 13 years of experience in providing procurement services as a

TXU employee.  Reilly's application indicated that he had received training in procurement

planning processes from Booz, Allen & Hamilton (a consulting firm that had been retained by

TXU to advise on that issue) and that he also had substantial experience in sourcing,

procurement, purchasing, contract negotiations, and leading cross-functional teams at TXU.

Although Reilly did not have extensive experience in strategic sourcing – up to that point

TXU had used tactical procurement methods – Dennis considered his background in

procurement sufficient to meet the advertised qualifications for the position.  Dennis interviewed

Reilly along with Mary Gano on May 3, 2002.

After his initial interview, Dennis invited Reilly to appear at a panel interview scheduled

for May 15, 2002. At his second interview, Reilly scored the highest of the group of interviewees

that had been selected from the best candidates of the first round interviews.   Reilly's average

score from the eight panel interviewers was 39.875; Dennis scored Reilly with a 38.

On July 29, 2002, after the completion of the interview process, Reilly met with Ezzell to

discuss various procurement issues.  Ezzell changed the subject to Reilly's May 2002 panel

interview.  Ezzell told Reilly that the interview went well and that Ezzell and the other managers

were impressed with Reilly.  Ezzell also told Reilly that Dennis "ha[d] a diversity issue" and

because Dennis was a member of the TXU Workforce Diversity Program, it would not look right

if Dennis had all white males reporting directly to her.

### 2.    Clunis's Interview Process

Clunis applied for the Startegic Sourcing Manager position as an external candidate after

corresponding with Dennis about openings at TXU.  On May 14, 2002, one day before Reilly's

second interview, Debbie Dennis responded to an email that Ayanna Clunis sent Dennis

inquiring about opportunities at TXU.  Clunis and Dennis had met at a lunch during 2001;

therefore, Dennis knew prior to the interview that Clunis was African-American.  Clunis

attached her resume to the email.  Dennis did not immediately recognize that Clunis was

qualified for the Strategic Sourcing Manager position and did not mention to Clunis that the

position was available.  Clunis emailed Dennis again on June 18, 2002, to request information on

available positions at TXU and again attached her resume.  Dennis reviewed Clunis's resume an

additional time and informed Clunis that she may not "have the specific skills that are required"

for the Strategic Sourcing Manager position. Dennis then forwarded Clunis's resume to HR to

see if they could confirm whether Clunis met the minimum qualifications.

Clunis's qualifications included the following education and work history: She graduated

from Cornell University with a degree in chemical engineering, and she received an MBA from

Duke University.  Clunis worked as a consultant with two different consulting firms – Booz

Allen Hamilton and Mercer Management Consulting.  In both of those positions she led strategic

sourcing efforts with a variety of clients.  Prior to her consulting work, she worked at Kraft

Foods, not only designing and testing products, but also implementing an overall manufacturing

process.

Despite the fact that Clunis also did not have extensive experience in strategic sourcing,

TXU's HR department determined that Clunis met the minimum requirements for the position.

Dennis and Geynille Dillingham (of TXU's HR) interviewed Clunis in a second set of interviews

after the job posting had been removed from the TXU website. Dennis and Dillingham

conducted a telephone pre-screen interview of Clunis on June 25, 2002.  Although the interview

process typically included an in-person interview with Dennis and then a panel interview for

each candidate, Clunis interviewed by telephone and then skipped right to a panel interview.

After the panel interviewed Clunis, Dennis scored Clunis with a 36, compared to scoring Reilly

with a 38.          **D.     Dennis Selected Clunis for the Strategic Sourcing Manager**
                             **Position**

After the nine interviews were complete and with input from the panel, Dennis decided to

hire Clunis for the Strategic Sourcing Manager position.  After making the decision to hire

Clunis, Dennis informed the other candidates, including Reilly, of the decision. Dennis informed Reilly that he had interviewed well, but TXU needed someone external to the company with strategic sourcing experience to take on the new strategic sourcing initiative.

### E.   Reilly Promoted

Shortly after Clunis assumed the Strategic Sourcing Manager position in, or around August 2002, Clunis selected Reilly as a Strategic Sourcing Representative Senior. Reilly served in that position until June 30, 2004. During the two years that Reilly worked for TXU after Dennis hired Clunis, Reilly did not complain to any management or human resources employee about not being selected for the position or about being discriminated against.

### F.   TXU Business Services Company Outsources a Significant Amount of its Business Functions, and the Employees Performing Those Functions, to Capgemini

In 2004, two years after Clunis was hired, the TXU subsidiaries underwent a major reorganization. Part of this reorganization entailed outsourcing several business functions that had previously performed by TXU Business Services and terminating the employees who had formerly performed those functions. Capgemini was one of the companies that entered into outsourcing contracts with TXU's subsidiaries. One outsourcing contract between Capgemini and TXU Energy Company LLC contemplated that on July 1, 2004, Capgemini would begin providing the TXU subsidiaries with several procurement services that were formerly provided by TXU Business Services.

Approximately 2,700 TXU employees were terminated from TXU as a result of its outsourcing contract with Capgemini. Reilly was one of those employees. In May 2004, Reilly was informed that he would be terminated from TXU on June 30, 2004, but that he could

essentially keep his position by performing procurement services for TXU as a Capgemini

employee. TXU sent similar letters to all TXU employees who were affected by the outsourcing

agreement.  That same day, Capgemini sent Reilly an offer of employment.  The letter stated that

if he chose to accept the position, he would be performing services similar to those he had been

performing for TXU Business Services.  Plaintiff accepted Capgemini's offer of employment and

started working for Capgemini on July 1, 2004.

### 1.    The Release Offered in Connection with the Outsourcing

In its May 18, 2004 letter, TXU offered all the transitioned employees, including Reilly,

certain special benefits in exchange for their execution of an agreement and release related to

their past employment with their respective TXU Corp. subsidiary.  One of the potential benefits

TXU offered to the transitioned employees who signed releases was a special severance package

jointly funded by TXU Corp. subsidiaries and Capgemini.  If laid-off from Capgemini within 18

months of starting employment, the employees who signed the release would receive the

severance package.  However, employment with Capgemini was not contingent upon signing the

release; the signing of the release merely guaranteed the employees the benefits of the severance

package.

Reilly choose not to sign the release because he did not want to waive any claims of

racial discrimination he may have had against TXU.  However, Reilly never told anyone – not

any TXU employee nor any Capgemini employee – that he was not going to sign the release and

never told anyone why he did not sign the release.

**2.     Under the Outsourcing Contract, TXU Informed Capgemini Which of the Transitioned Employees Signed the Release**

TXU was contractually obligated to inform Capgemini which transitioned employees signed the release. Naturally, Capgemini had to be aware of its obligations to any transitioned employees in the event of a termination.  Further, because the special severance benefits offered in exchange for the release were jointly funded with Capgemini, Capgemini would be responsible for actually paying the special severance benefits to transitioned employees if it were to lay-off employees within the first 18 months of their employment with Capgemini.  After the deadline to sign and return the release passed, TXU sent a list of all transitioned employees who signed the release to Capgemini's human resources department.

**G.     Capgemini Laid-Off Reilly and Other Employees in a Reduction-In-Force.**

In October 2004, Capgemini laid-off approximately 20 employees from its Supply Chain Service Line as part of a reduction in force.  Reilly's employment was terminated as part of this reduction in force.  On or about October 27, 2004, Bob Gentry, Reilly's manager at Capgemini, informed him that Capgemini was eliminating his position.  Although Capgemini laid Reilly off within 18 months of hiring him, Reilly was not entitled to, and did not receive, the special severance benefits because had not signed the release.

12

## II. ANALYSIS

### A.    Reilly's Racial Discrimination Claim

Section 1981 states that all persons in the United States shall have the same contractual rights as white citizens. 42 U.S.C. § 1981(a). The Supreme Court has held that §1981, like Title VII, prohibits racial discrimination in private employment against anyone on the basis of race: white or  nonwhite.  *See McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 286-87 (1976).

Doctrinally, claims of race-based employment discrimination under §1981 are substantively identical to claims of racial discrimination under Title VII.  *Pegram v. Honeywell, Inc.*, 361 F.3d 272, 281-82 (5th Cir. 2004); *Anderson v. Douglas & Lomason Co.,* 26 F.3d 1277, 1284 n. 7 (5th Cir.1994).  Accordingly, claims of racial discrimination brought under § 1981 are governed by the same evidentiary framework used to evaluate claims of employment discrimination brought under Title VII.  *Pratt v. City of Houston*, 247 F.3d 601, 605 n.1 (5th Cir. 2001).

To withstand an employer's motion for summary judgment, the plaintiff-employee must present sufficient evidence – whether by direct or circumstantial evidence (or both) – to create a genuine issue of fact that he or she was discriminated against by an employer.  *See Rachid v. Jack in the Box, Inc.,* 376 F.3d 305, 312 (5th Cir. 2004). Employees generally have two options for making this threshold showing.  They may either (1) present direct evidence that raises a genuine issue of material fact as to whether the plaintiff's protected characteristic was a motivating factor for the adverse employment decision or (2) establish a permissible inference of discrimination by relying on the burden-shifting framework erected by *McDonnell Douglas*

13

*Corp. v. Green*, 411 U.S. 792 (1973) and its progeny.  *See Machinchick v. PB Power, Inc.*, 398

F.3d 345, 350 (5th Cir. 2005) (ADEA); *Fierros v. Texas Dept. of Health*, 274 F.3d 187, 192 (5th

Cir. 2001) (Title VII retaliation); *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310, 318

(4th Cir. 2005).

Therefore, the analysis that a court should employ in an employment discrimination case

depends on whether the plaintiff offers direct evidence of discrimination.  *See Trans World*

*Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985); *see also*, *Jones v. Robinson Prop. Group,*

427 F.3d 987, 992 (5th Cir. 2005); *Fabela v. Socorro Indep. Sch. Dist.*, 329 F.3d 409, 414-15

(5th Cir. 2003).  Where a plaintiff provides direct evidence of discrimination, then "the

*McDonnell Douglas* test is inapplicable." *Thurston*, 469 U.S. at 121; *see also, Jones*, 427 F.3d at

992; *Rachid*, 376 F.3d at 309.  If, however, the employee can only muster circumstantial

evidence of discrimination, then he or she must rely on the *McDonnell-Douglas* burden-shifting

framework to create a presumption of discrimination in order to withstand an employer's motion

for summary judgment.  *See Rachid*, 376 F.3d at 312.

### 1.      Direct Evidence

The Court will first determine if Reilly has produced direct evidence of race

discrimination.  Direct evidence is evidence which, if believed, proves the fact in question

without inference or presumption.  *Jones*, 427 F.3d at 992; *Fabela*, 329 F.3d at 415.  In the

employment discrimination context, this includes "any statement or document which shows on

its face that an improper criterion served as a basis – not necessarily the sole basis, but a basis –

for [an] adverse employment action." *Fabela*, 329 F.3d at 415 (citing *Fierros*, 274 F.3d at 192);

*see also Akop v. Goody Goody Liquor*, *Inc.*, 2006 WL 119146 *3 (N.D. Tex. 2006).  However,

"[i]f an inference is required for the evidence to be probative as to an employer's discriminatory animus . . ., the evidence is circumstantial, not direct." *Wilber v. Tharaldson Employee Mgmt. Co.*, 2005 WL 3018262 *6 (N.D. Tex. 2005) (citing *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 897-98 (5th Cir. 2002)).

According to Reilly, Ben Ezzell told him that Dennis "ha[d] a diversity issue" and that because of her role on the TXU Workforce Diversity Committee it would not look right if she had all white males reporting directly to her.  Reilly claims that Ezzell's comment qualifies as direct evidence that Reilly's race was a motivating factor in his nonselection.

In order for a discriminatory comment or remark to constitute direct evidence of employment discrimination, the Fifth Circuit has held that it must meet the four-factor test set forth in *Brown v. CSC Logic, Inc.*, 82 F.3d 651 (5th Cir. 1996).  *See Laxton v. Gap, Inc*., 333 F.3d 572, 583 n.4 (5th Cir. 2003); *Auguster v. Vermilion Parish Sch. Bd*., 249 F.3d 400, 405-406 (5th Cir. 2001).  Under that test, a person's workplace remark will constitute direct evidence of discrimination if it: (a) pertains to the protected class of persons of which the plaintiff is a member, (b) is proximate in time to the employment decision at issue, (c) is made by an individual with authority over the employment decision at issue, and (d) is related to the employment decision at issue.  *Auguster*, 249 F.3d at 405 (citing *CSC Logic*, 82 F.3d at 655).

Despite viewing the evidence in the light most favorable to Reilly, the Court finds that Ezzell's alleged statement is not direct evidence of discrimination.  Although Ezzell did interview Reilly for the strategic sourcing position, there is no evidence in the record that Ezzell himself had any authority to hire Reilly.  Rather, the evidence in the record establishes, without dispute, that Dennis was the person who made the ultimate hiring decision.  Additionally, even if

15

the Court were to consider the possibility that Ezzell may have influenced Dennis's ultimate

choice for the position, there is simply no evidence that Ezzell himself was motivated by racial

concerns while attempting to influence Dennis's choice for the strategic sourcing position.

Ezzell's comment merely attributes racial motivation to Dennis, not to himself.

To the extent that Reilly attempts to use Ezzell's comment as evidence that Dennis's

hiring decision was motivated by race, the Court finds that the remark is not competent summary

judgment evidence of Dennis's motive.  On its face, Ezzell's comment attributes a

discriminatory motive to Dennis but does not lay any foundation for how Ezzell knew this to be

true.  There is no evidence in the record that Dennis ever stated this to be true or adopted or

acquiesced to such a statement.

In order for Ezzell's comment to qualify as direct evidence, the Court must presume that

Ezzell accurately perceived Dennis's motivations for not choosing Reilly.  Because direct

evidence of employment discrimination is such evidence that, if believed, proves an employer's

discriminatory animus "*without inference or presumption*," Ezzell's alleged comment cannot be

considered direct evidence of employment discrimination.  *Jones*, 427 F.3d at 992 (emphasis

added).  Reilly's reliance on *Vance v. Union Planters, Inc.,* 209 F.3d 438 (5th Cir. 2000) misses

the point.  In that case the statement that the decision-maker wanted a "mature man" for the

position was made *by the decision maker. Id.* at 441-42.  Here, Ezzell's comment that Dennis

"had a diversity issue" and that it would not look right if she had all white males reporting

directly to her was not even attributed to Dennis.  The only evidence Reilly presented to this

Court establishes that a non-decision maker commented on his perceived motivations for the

decision maker's action.  This evidence is not direct evidence of discrimination.  Although

16

Ezzell was Reilly's direct supervisor and a member of the panel that interviewed Reilly and Clunis for the Strategic Sourcing Manager position, Reilly produced no evidence that Ezzell had the authority to make the hiring decision of which Reilly complains.

### 2.      Circumstantial Evidence

In the absence of direct evidence of discriminatory intent, courts rely on the *McDonnell-Douglas* burden-shifting framework to determine whether a genuine issue of material fact exists establishing that employment discrimination occurred. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141-42 (2000). In this regard, the *McDonnell Douglas* framework is intended "[to] compensate for the fact that direct evidence of intentional discrimination is hard to come by." *Price Waterhouse v. Hopkins*, 490 U.S. 228, 271 (1989) (plurality opinion) (O'Connor, J., concurring in the judgment).

In light of the Supreme Court's decision in *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003), the Fifth Circuit has adopted a modified *McDonnell Douglas* framework for analyzing employment discrimination claims that rely exclusively on circumstantial evidence. *See Rachid*, 376 F.3d at 312. Under the "Modified *McDonnell Douglas*" approach, a plaintiff must first demonstrate a prima facie case of discrimination by a preponderance of the evidence. *Id.*, 376 F.3d at 312. In failure to hire cases, a plaintiff may raise a prima facie case of discrimination by showing that he or she (1) is a member of a protected class; (2) was qualified for the position sought; (3) was not selected for the position; and (4) that the position sought was filled by someone outside the protected class or under circumstances suggesting a discriminatory motive. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *Rutherford v. Harris County, Tex.*, 197 F.3d 173, 179 (5th Cir. 1999).

If the plaintiff meets this initial burden, an inference of intentional discrimination arises, and the burden shifts to the defendant to produce evidence of a legitimate, nondiscriminatory reason for the adverse action.  *See Reeves*, 530 U.S. at 142.  At this stage, the employer's burden "is one of production, not persuasion: it 'can involve no credibility assessment.'"  *Id.* (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)); *Baker v. Am. Airlines*, 430 F.3d 750, 753-54 (5th Cir. 2005).

Once the defendant produces evidence of a legitimate, nondiscriminatory reason for the adverse action, "the presumption of discrimination created by the plaintiff's prima facie case disappears and the plaintiff must meet its ultimate burden of persuasion on the issue of intentional discrimination."  *Machinchick*, 398 F.3d at 350.  Consequently, the burden shifts back to the plaintiff to show that either (1) the defendant's reason is not true, but is instead designed to serve as pretext for unlawful discrimination; *or* (2) that the defendant's reason, even if true, is only one of the reasons for the adverse action and that race is nevertheless a 'motivating factor' for the adverse action.  *Machinchick*, 398 F.3d at 351-52; *Rachid*, 376 F.3d at 312.  A plaintiff may carry that burden with either direct or circumstantial evidence.  *Desert Palace,* 539 U.S. at 101-02.

TXU has not challenged Reilly's ability to state a prima facie case of racial discrimination, but TXU does argue that it had a legitimate non-discriminatory reason for not hiring him for the strategic sourcing position – i.e., that he was less qualified for the position than Clunis. TXU claims that Reilly was not the most qualified applicant for the position since Clunis "had the special skills and experience needed to implement and carry out the company's new strategic sourcing initiative."  Specifically, Dennis claims she found Clunis more qualified

18

for the position than Reilly because: (1) she had a superior educational background; (2) had a more well rounded and relevant work experience; (3) Had work experience involving strategic planning and working with analytical techniques and tools, whereas Reilly's experience related more to transactional and tactical procurement activities; (4) had significant experience with strategic sourcing, which Reilly did not have; (5) had experience with implementing strategic sourcing at large corporations as a consultant, which Reilly had not done; (6) had consulting experience that provided her with valuable experience leading strategic sourcing efforts evaluating processes, spend categories, and finding opportunities to reduce the total cost of ownership, which Reilly did not have; (7) had done significant financial modeling, which Reilly had not; (8) had supervisory and management experience, which Reilly did not have; (10) had demonstrated through her previous employment that drive and initiative were strengths, and Reilly had not; (11) had interpersonal, team building, and leadership skills that Reilly did not have, including bringing people together with different interests to achieve a desirable end result for the company; and  (12) was a good fit for the Strategic Sourcing Manager position. Further, because TXU had never before performed broad-based strategic initiatives, Dennis believed that Reilly did not have, and could not have had, the opportunity to perform significant strategic sourcing activities that were crucial to the position.

Because TXU has succeeded in presenting some legitimate nondiscriminatory reason for hiring Clunis over Reilly, the burden now shifts to Reilly to produce evidence of discriminatory intent.  *See Machinchick*, 398 F.3d at 350.  To carry this burden, Reilly must offer sufficient evidence to create a genuine issue of material fact that the proffered nondiscriminatory reasons for his nonselection are false or unworthy of credence (i.e., "pretext" for discrimination) or, even

if true, that his race was nevertheless a motivating factor for his nonselection.  *Id.* at 351-52;
*Rachid*, 376 F.3d at 312.

### a.      Pretext

Reilly may withstand TXU's motion for summary judgment if he is able to show that the
company's rationale for not hiring him – i.e., that Clunis was better qualified for the position – is
pretext for race discrimination.  *See Reeves*, 530 U.S. at 143; *Patrick v. Ridge*, 394 F.3d 311, 315
(5th Cir. 2004).  To prove pretext, "a plaintiff need only bring evidence that enables the jury to
disbelieve that the employer's proffered justification truly motivated the adverse employment
action."  *Laxton*, 333 F.3d at 580 n.2 (citing *Reeves*, 530 U.S. at 147); *Bauer v. Abermarle Corp.*,
169 F.3d 962, 967 (5th Cir. 1999) ("Evidence that the proffered reason is unworthy of credence
must be enough to support a reasonable inference that the proffered reason is false; a mere
shadow of doubt is insufficient.") (quotation and citation omitted).

In the Fifth Circuit, to show that an employer's rationale for refusing to hire a plaintiff is
pretext for unlawful discrimination, a plaintiff must show that he or she was "clearly better
qualified"  than the person selected for the position.  *Manning v. Chevron Chemical Co.*, 332
F.3d 874, 882 (5th Cir. 2003) (quoting *Price v. Fed. Express Corp.*, 283 F.3d 715, 723 (5th Cir.
2002)).  The Fifth Circuit "has repeatedly and emphatically stated that anti-discrimination laws
are not vehicles for judicial second guessing of business decisions."  *Mato v. Baldauf*, 267 F.3d
444, 453 (5th Cir. 2001) (citation omitted).  Therefore, the "disparities in qualifications must be
of such weight and significance that no reasonable person, in the exercise of impartial judgment,
could have chosen the candidate selected over the plaintiff for the job in question."  *Ash v. Tyson
Foods,* 126 S. Ct. 1195, 1197 (2006) (quoting *Cooper v. Southern Co.,* 390 F.3d 695, 732 (11th

Cir. 2004).

After reviewing the summary judgment evidence in the light most favorable to Reilly, the Court finds that he has not presented sufficient evidence to create a genuine issue of material fact that TXU's rationale for hiring Clunis instead of Reilly for the Strategic Sourcing Manager position was pretext for racial discrimination.  In particular, Reilly has not presented sufficient evidence to establish that he was "clearly better qualified" than Clunis for the strategic sourcing position.

Reilly argues that, by comparison, Clunis's limited work experience in procurement or energy services, her limited managerial experience, her lower interview score, and her similar educational background are sufficient to show that Reilly was clearly better qualified for the position. The Court is not persuaded.  The summary judgment evidence indicates that the company intended to hire someone with a specialized background in strategic sourcing in order to lead the company's transition toward that model of procurement.  To the extent that Reilly claims that the job posting solicited applicants with "[either] procurement or strategic sourcing experience," he is mistaken.  The job posting explicitly requested that prospective applicants with an MBA have "5 to 7 years of strategic sourcing experience."  Although it is true that Clunis did not have extensive strategic sourcing experience, Reilly also did not have such experience since, according to Dennis, his prior work experience at TXU did not involve strategic sourcing on any significant level.

While it is true that Reilly presented a long and impressive work history with TXU, this does not refute TXU's reasons for hiring Clunis rather than Reilly.  Clunis, too, had an equally impressive work history and educational background.  Clunis's shorter experience in

procurement, limited managerial experience and slightly lower interview score, by comparison, do not establish that she was "clearly less qualified" for the strategic sourcing position. According to Dennis, Clunis's prior work experience in strategic sourcing, her consulting background, her quantitative skills, her distinguished educational pedigree (B.S.E. Cornell, M.B.A. Duke), her drive and initiative, and her interpersonal savvy offset Reilly's qualification for the position.

These differences in qualifications, whatever their weight and significance, are not so disparate that Court is compelled to conclude that no reasonable person, in the exercise of impartial judgment, would have chosen Reilly over Clunis for the strategic sourcing position. *Cf. Price*, 283 F.3d at 723 (finding that plaintiff's more substantial education, work experience, and tenure with the company did not demonstrate that he was clearly better qualified than the candidate selected). The Fifth Circuit has admonished its courts to refrain from second guessing the manner in which an employer weighs certain qualifications over others, as long as the weight given to those criteria is rational and consistent. *See EEOC v. La. Office of Cmty. Servs.*, 47 F.3d 1438, 1445-46 (5th Cir. 1995) ("[W]e decline to substitute our judgment for the employer in evaluating what types of experience are most valuable for an employee in [a] new position in the absence of proof that the standards were not consistently applied or were so irrational or idiosyncratic as to suggest a cover-up.")

Reilly has not offered any competent summary judgment evidence apart from his own self-serving conclusory allegations to contradict Dennis's opinion that Clunis was the most qualified candidate for the position. Likewise, there is no evidence in the record that *any* of Reilly's interviewers believed him to be better qualified than Clunis for the strategic sourcing

position.

Because Reilly has failed to meet his burden of producing sufficient evidence showing that he was "clearly better qualified" than Clunis for the strategic sourcing position, the Court finds that Reilly cannot withstand summary judgment on the issue of pretext.  The Fifth Circuit has set a high bar for plaintiffs in employment discrimination cases who allege that they were not promoted for discriminatory reasons, and there is no reason why this high evidentiary standard should be enforced with any less vigor in cases involving a white plaintiff.  On this sparse evidentiary record, the Court declines Reilly's invitation to delve into the intricacies of TXU's hiring needs and boldly second-guess its business judgment on who was the most qualified applicant for Strategic Sourcing Manager.

### b.     Mixed Motive

Reilly can also survive summary judgment on his failure to promote claim by producing evidence that racial discrimination was a motivating factor when Dennis hired Clunis as the Strategic Sourcing Manager rather than promoting Reilly.  *See Rachid,* 376 F.3d at 312*.* Reilly has not presented evidence raising a genuine issue of material fact that TXU's decision to hire Clunis and not Reilly was motivated by race.

Reilly's evidence related to intentional discrimination based on race are: that TXU's procurement department had target benchmarks for filling manager positions with minorities in 2002, that Dennis was a leader of TXU's diversity initiatives, and that Ben Ezzell told Reilly that Dennis "ha[d] a diversity issue" and that, because of her role on the TXU Workforce Diversity Committee, "it would not look right if [she] had all white males reporting directly to her."

Merely having an affirmative action plan is not evidence of illegal discrimination. *See*

*Denney v. City of Albany*, 247 F.3d 1172, 1188 (11th Cir. 2001) ("[c]ourts have been extremely wary of citing lawful affirmative action plans as evidence of an employer's pretext"); *Cerrato v. San Francisco Cmty. Coll. Dist*., 26 F.3d 968, 976 (9th Cir. 1994) (mere fact of an affirmative action plan's existence is not evidence of discrimination); *Christensen v. Equitable Life*, 767 F.2d 340, 343 (7th Cir. 1985).

The mere fact that TXU had diversity goals does not provide the Court with evidence that by hiring Clunis, Dennis was attempting to meet a diversity goal or that TXU intentionally discriminated against Reilly based on his race.  The Court must make only reasonable inferences based on the facts presented by Reilly, and the Court cannot reach out and latch hold of Reilly's mere conclusion, unsupported by fact, that Dennis's decision to hire Clunis instead of Reilly was an attempt to fulfill some kind of racial quota.  Reilly failed to provide the Court with any facts to support such a conclusion.

Reilly's only factual support for the contention that race was a motivating factor in the decision to hire Clunis rather then Reilly is Ben Ezzell's remark that Dennis would not want all white males reporting to her.  However, Ezzell's remark amounts to nothing more than a "stray remark" by a non-decision maker.  Therefore, it does not give rise to a genuine issue of material fact regarding discriminatory intent. *See Scales v. Slater,* 181 F.3d 703, 712 (5th Cir. 1999).

Based on Reilly's lack of summary judgment evidence, the Court concludes that Reilly failed to present the Court with a genuine issue of material fact that TXU's decision to hire Clunis rather than Reilly was motivated by racial discrimination. Therefore, the Court GRANTS summary judgment for TXU on Reilly's claim that TXU discriminated against him on the basis of race when it failed to promote him to Strategic Sourcing Manager.

B.        **Plaintiff's Retaliation Claim**

Defendants have also moved for summary judgment on Reilly's retaliation claim.  A claim of retaliation is cognizable under §1981 in the same manner as a claim of retaliation under Title VII.  *See Shackelford v. Deloitte & Touche, LLP,* 190 F.3d 398, 404 n.2 (5th Cir. 1999).  For that reason, retaliation claims brought under §1981 are evaluated in the same manner as retaliation claims brought under Title VII.. *Id.*

The Fifth Circuit has held that the *McDonnell Douglas* framework applies to retaliation claims in which an employee has not offered any direct evidence that an employer retaliated against him or her for engaging in protected activity or opposing an unlawful employment practice.  *Long v. Eastfield College*, 88 F.3d 300, 304 (5th Cir. 1996).

To establish a prima facie case of retaliation, a plaintiff must show that (1) he or she was engaged in protected activity; (2) he or she suffered an adverse employment action; and (3) a causal link existed between the protected activity and the adverse employment action.  *See Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004); *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 427 (5th Cir. 2000).  "With respect to the first element..., '[a]n employee has engaged in activity protected by Title VII if she has either (1) opposed any practice made an unlawful employment practice by Title VII or (2) made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII." *Hamlett v. Gonzales*, 2005 WL 1500819 * 17 (N.D. Tex. 2005) (quoting *Long v. Eastfield College*, 88 F.3d at 304).

Once a plaintiff establishes a prima facie case of retaliation, an inference of retaliation arises and the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason

for the alleged retaliatory action.  *See Long*, 88 F.3d at 304-05.  To withstand summary

judgment, the plaintiff must then show that the defendant's reason is a pretext for unlawful

retaliation or that his protected activity was a motivating factor for the adverse action. *McCarthy,*

2005 WL 3428191 at *4.

　　　Reilly has presented no evidence to support a prima facie case of retaliation.  The crucial

evidence missing to support Reilly's claim of retaliation is any knowledge on the part of anyone

at TXU or Capgemini that Reilly intended to file a discrimination suit against TXU.  In order for

Reilly's refusal to sign the release to be considered "protected activity," he must have made

known his reason for not signing it, i.e. racial discrimination in failing to promote him to

Strategic Sourcing Manager. *See, e.g., Moore v. United Parcel Serv.,* 2005 WL 2436922, at *4

(5th Cir. 2005) (per curium) (filing grievance that UPS violated union agreement did not

constitute protected activity because employee did not mention racial discrimination); *Watts v.*

*Kroger Co.,* 170 F.3d 505, 511 (5th Cir. 1999) (complaint to superior which simply mentions the

employee's personal life and never mentions sexual harassment is not protected activity);

*Alverez v. United Parcel Serv.,* 398 F. Supp. 2d 543, 551-52 (N.D. Tex. 2005) (finding employee

failed to present prima facie case of retaliation where employee never mentioned racial

discrimination in altercation with employer to challenge supervisor's refusal to pay him for a

half hour of work).　　Further, Reilly's retaliation claim presumes that a causal link existed

between his refusal to sign the general release – which Reilly characterizes as "protected

activity" – and TXU's decision to submit his name to Capgemini as one of the transitioned

employees who did not sign the release.  Again, the critical underlying assumption of this claim

is that TXU was aware of his intent to challenge his non-selection as discriminatory and that it

acted in retaliation by informing Capgemini of his failure to sign.

Reilly's discrimination claim against TXU relates to the failure to promote him, in July 2002, to Strategic Sourcing Manager.  Reilly continued to work at TXU, in the same department, until July 2004.  Reilly never complained to anyone about his non-selection.  Reilly certainly never made anyone at TXU aware that he considered the non-selection a discriminatory act or that he intended to file a lawsuit based on that alleged discriminatory act.  Therefore, when Reilly failed to sign a release of claims against TXU when transitioning to Capgemini, a release given to all transitioning employees, no one at TXU could have known Reilly's reasons for refusing to sign.  The undisputed evidence establishes that he never protested the signing of the release to anyone, nor did he inform anyone of his intent to sue TXU for discrimination.  Therefore, the undisputed summary judgment evidence establishes that when TXU notified Capgemini that Reilly had not signed a release, it did so for legitimate non-discriminatory reasons – namely, to comply with a contractual obligation.  Because TXU did not know of Reilly's intent to file a lawsuit for discrimination, it could not have had a retaliatory purpose in notifying Capgemini of Reilly's failure to sign the release.

Because Reilly has not produced any evidence to show that any TXU employee was aware of his intent to file a discrimination claim based on his non-selection for the strategic sourcing position, his prima facie case fails.  Therefore, the Court GRANTS summary judgment for TXU on Reilly's claim of retaliation.

### III. Conclusion

For the reasons stated above, the Court **GRANTS** TXU's Motion for Summary

Judgment. A final judgment will issue by separate order.

**IT IS SO ORDERED**

**ENTERED: September 8, 2006**

_____
**HON. JERRY BUCHMEYER**
**SENIOR UNITED STATES DISTRICT JUDGE**
**NORTHERN DISTRICT OF TEXAS**